IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Cynthia Reid,<br><br>             Plaintiff,<br><br>    vs.<br><br>Michael J. Astrue,<br>Commissioner of Social Security,<br><br>            Defendant. | Civil Action No. 6:10-2118-MBS-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on April 27, 2005, alleging that she became unable to work on November 8, 2002. The application was denied initially and on reconsideration by the Social Security Administration. On April 11, 2006, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Karl S. Weldon, a vocational expert, appeared on June 16, 2008, considered the case *de novo*, and on August 14, 2008, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on June 17, 2010. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

> 2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 8, 2002, through her date last insured of December 31, 2007 (20 C.F.R. §§ 404.1520(b) and 404.1571 *et seq.*).

> 3. Through the date last insured, the claimant had the following severe combination of impairments: status-post discectomy and fusion at C6-7, degenerative disc disease, obesity, and depression (20 C.F.R. § 404.1520(c)).

> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

> 5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567 (c) except she was unable to use her upper extremities to perform overhead work. Due to symptoms of depression and pain, she was unable to perform more than the simple routine repetitive tasks of unskilled work.

> 6. Through the date last insured, the claimant's past relevant work as a waitress and cashier did not require the performance

of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

7. The claimant was not under a disability as defined in the Social Security Act, at any time from November 8, 2002, the alleged onset date, through December 31, 2007, the date last insured (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

3

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was born on March 26, 1961. She is a high school graduate and attended one year of technical college. Her past relevant work included grinder operator, tool crib worker, waitress, and cashier. She alleged that she became disabled on November 8, 2002, at which time she was 41 years old, due to limitations caused by osteoarthritis and permanent nerve damage in her hands (Tr. 63, 78-83, 110, 114).

In April 2002, the plaintiff reported to John McGuirt, M.D., for treatment of hand pain. Dr. McGuirt opined that the plaintiff had premature and advanced osteoarthritis in her hands. He opined that the plaintiff was not fit for heavy manual labor involving her hands, but otherwise had a satisfactory occupational history. He recommended she work at a job that would not perpetuate or exacerbate her osteoarthritis and her condition. In February 2003, the plaintiff returned to Dr. McGuirt complaining she could not move her left arm. Dr. McGuirt noted that the plaintiff had an "impressive case" of cervical spondylosis with radiculopathy and referred her for a neurological evaluation (Tr. 292-98). She had back surgery in March 2003 (Tr. 258). After the surgery, in May 2003, the plaintiff reported that she had a "dramatic improvement in pain." In addition, her osteoarthritis of the hands "was no longer bothersome," a result Dr. McGuirt attributed to her surgery and change in work status (Tr. 289-90).

In August 2004, the plaintiff reported to Carol Kooistra, M.D., for an independent medical evaluation. Dr. Kooistra noted the plaintiff's past medical history, including her March 2003 cervical spine surgery. The plaintiff complained of pain in her left

shoulder that worsened with use of her arm above shoulder height, or with cleaning, vacuuming, sweeping, or yard work. Examination showed slight reduced range of motion in the cervical spine, muscle guarding and trigger points in the left trapezius region, and pain in the scapular region. She had mild weakness in her left triceps and hand muscles, and possible atrophy on the left. Reflexes were 2+ and her strength was 31 kilograms on the right and 12 kilograms on the left. Dr. Kooistra assigned the plaintiff a 15 percent impairment of her left upper extremity (Tr. 299-301).

In December 2004, the plaintiff reported to Wes Merriwether, M.D., for an examination to determine whether she could return to work. He noted that the plaintiff had excellent grip strength, normal hand and finger function, and normal upper extremity range of motion. Dr. Merriwether opined that the plaintiff would not be fit for duty for a job requiring frequent strenuous hand use (Tr. 302).

In June 2005, the plaintiff reported to Charles Thomas, M.D., for a medical evaluation. The plaintiff told Dr. Thomas that she had neck pain, "but nothing like before the surgery." She also complained of low back pain radiating to her legs and knee pain. She said that her hands swell and hurt. On examination, the plaintiff was able to rise to a standing position without difficulty, heel and toe walk, do three-quarters of a squat, and get on the examination table. She answered questions lucidly and appropriately. She had reduced range of motion in her cervical spine, lumbar spine, shoulders, and hips, but normal range of motion otherwise. There was no spasm in the neck or lumbar spine (Tr. 304-07). Her hands showed no swelling, induration, deformity, or loss of range of motion. Motor, sensory, and reflex examinations were normal, except for decreased sensation in two digits on the left hand. There was no atrophy noted. X-rays of the knees showed a mild decrease in the medial joint space, but were otherwise normal. X-rays of the hands and wrists showed minimal degenerative changes at the base of both thumbs, but were

otherwise normal. X-rays of the lumbar spine showed significant decrease of the disk space at the L5-S1 level of the spine and some spurring (Tr. 305, 306).

In June 2005, Mary Payne, M.D., a State agency consultant reviewed the plaintiff's medical records and concluded that the plaintiff did not have a severe impairment (Tr. 308). Later in 2005 and in early 2006, the plaintiff sought treatment from Ronald DeGarmo, D.O, for arthritis. Dr. DeGarmo's notes did not reflect extensive examinations, but did note that the plaintiff's neck was supple. In January 2006, Dr. DeGarmo noted that the plaintiff had tenderness in the cervical spine, and an x-ray revealed a herniated disc at the C6-C7 level of the spine. The plaintiff wanted Dr. DeGarmo to "fill out forms for disability," but he declined because he "did not have adequate information to document that" and "could not fill out the forms with good conscience" (Tr. 312).

The plaintiff was evaluated in the emergency room of Allen Bennett Hospital on March 5, 2006. She complained of pain in her upper back, right shoulder blade, and her neck with headache. Her final diagnosis was acute cervical pain, chronic, and acute upper back pain. She received an injection of Norflex Injectable and was given prescriptions for Darvocet and Flexeril for pain (Tr. 316-23).

In March 2006, Dale Van Slooten, M.D., a State agency physician, reviewed the plaintiff's medical records and assessed her residual functional capacity (Tr. 324-31). Dr. Van Slooten opined that the plaintiff could lift, carry, push, and pull 50 pounds occasionally and 25 pounds frequently; could sit about six hours in an eight-hour workday; could stand or walk about six hours in an eight-hour workday; and had no other limitations (Tr. 325-30).

The plaintiff continued to seek treatment from Dr. DeGarmo. His examination notes again did not reflect extensive findings (Tr. 363-64). In January 2007, he wrote "[w]e filled out some physical forms saying that she really cannot spend more than 1-2 hours a day standing, sitting, or walking. It is hard to do that more than 15 minutes at a time. Also

7

the medicine that she is taking would greatly restrict her ability to work an 8 hour day without having frequent breaks" (Tr. 363). Dr. DeGarmo completed a Physical Capacities Evaluation. Among other determinations, he concluded that the plaintiff could sit, stand, and walk for two hours each (for a total of six hours) in an eight-hour workday; and could lift no more than 10 pounds. He also indicated that the plaintiff could not squat, crawl, climb, or reach, but could bend occasionally (Tr. 360). He also completed a Clinical Assessment of Pain form, indicating that the plaintiff's pain would severely limit even the most simple everyday tasks, her pain medications restricted the plaintiff's activities, and that physical therapy had not helped (Tr. 361).

On March 29, 2007, Dr. DeGarmo noted that the plaintiff had sharp pains in her hands and feet. He prescribed Flexeril and Lortab (Tr. 362).

C. David Tollison, Ph.D. of Carolina Centers for Advanced Management of Pain performed a diagnostic evaluation of the plaintiff on March 19, 2008 (Tr. 365-69). Dr. Tollison elicited an extensive history, reviewed medical records, performed a mental status examination, and administered objective test. Dr. Tollison stated:

> The MMPI was administered. Testing was statistically valid. There is no suggestion of test manipulation, magnification, embellishment, or denial of her current and true level of psychological functioning. It should be noted that the patient was unable to sit or stand for prolonged periods of time. Throughout the evaluation as well as throughout test administration the patient would alternate sitting and standing.
>
> MMPI interpretation evidences more than the usual number of chronic physical complaints, pain problems, and health related issues. Pain, suffering, and functional limitation appear to occupy much of her thought, attention and concentration. She may tend to monitor and scan her body for changes in physical symptoms and likely perceives her medical condition as severe and disabling. In addition, testing confirms a significant intensity of clinical depression. Associated with her depression are likely to be feelings of worthlessness, uselessness, poor self-esteem and self-concept, sadness, discouragement, dysphoria, anhedonia, and feeling as if there is little to look

> forward to. She likely perceives herself as a victim of a
> controlling intensity of pain and may feel powerless to change
> her condition. Neurovegatative symptoms of depression are
> likely.

(Tr. 367). Dr. Tollison's diagnosis included major depressive disorder, somatoform

disorder, and a GAF score of 50. Regarding the plaintiff's resulting limitations, Dr. Tollison

found that the plaintiff,

> suffers frequent (34-66%) impairment in social functioning, a
> constant (greater than 67%) impairment in activities of daily
> living, a constant (greater than 67%) impairment in
> concentration/persistence/pace, and an occasional (less than
> 34%) impairment in episodes of deterioration in functioning.
> The patient experiences increased pain with activity as well as
> chronic fatigue and is expected to require more than the usual
> number of rest periods and breaks. It is unlikely she could
> consistently meet over time the concentration and productivity
> levels typically required in a work setting. Work pressures,
> stresses, and demand situations are expected to result in
> deterioration in her psychological symptoms. Her condition is
> chronic and expected to continue over the next twelve or more
> months. If awarded funds, Ms. Reid is capable of managing
> funds.

(Tr. 367).

At the administrative hearing, the plaintiff testified that she was 47 years old.

She said she had been laid off from her last job. She said she had received unemployment

and workman's compensation benefits (Tr. 463, 465-66). The plaintiff alleged that she

could not work due to shoulder and arm pain (Tr. 465). She said she had extreme pain

going down her arms and numbness in fingers on both hands (Tr. 472-73). She said that

she had undergone three hernia surgeries in 2000 and 2001 that kept her out of work. She

said that she had undergone neck surgery in March 2003, which helped for a little while.

She said she needed surgery again. She said she took medication for pain, and without

the medication she could not get out of bed. She said the medication eased some of the

pain, but caused her to lose focus (Tr. 475-76, 477-79). She said her pain was at about a

9

nine on a scale of one to ten, with ten being the worst pain. She said she occasionally wore a neck brace (Tr. 483, 484).

The plaintiff testified she had a driver's license and drove occasionally (Tr. 464-65). She said she drove to church twice a week and to the grocery store twice a week. She said that she taught Sunday school classes at church. She said she was able to make her bed and take care of her personal hygiene. She said that she spent most of the day watching television. She claimed she could sit or stand for 15 to 20 and then had to change positions (Tr. 465, 486, 479-80). She said she liked to grow flowers, but had stopped in 2005. She said that she had gone to Oklahoma to see her son graduate from basic training (Tr. 486, 488).

Karl Weldon, a vocational expert, also testified at the hearing. Mr. Weldon testified that the plaintiff's past work was as a grinder operator was "really divided into two different jobs." The jobs were semi-skilled and required light and medium exertion. He said she had also worked as a tool crib attendant, waitress, and cashier, all of which required light exertion and were unskilled. The ALJ asked Mr. Weldon to consider a person of the plaintiff's age, with the same education and work history. The person was limited to medium work, could not perform overhead work with either hand, and could only perform unskilled work. Mr. Weldon testified that the hypothetical person could perform the plaintiff's past work as a waitress and cashier (Tr. 490-92).

The plaintiff submitted additional evidence, divided into 16 exhibits, to the Appeals Council after the ALJ issued his decision. The first exhibit was a letter from Dr. Kooistra, dated May 2009. Dr. Kooistra wrote that testing showed that the plaintiff had "significant carpal tunnel problems in both hands" and could only occasionally use her hands for fingering, gross manipulation, and fine manipulation (Tr. 375). The second exhibit was a questionnaire completed by Douglas Whitehead, M.D., in March 2009 (Tr. 376). He opined that the plaintiff should limit her writing; could not walk or stand for more than a few

minutes during a work day; and would miss more than five days of work per month if she tried to work on a full-time basis (Tr. 376). The third exhibit was a "New Patient Evaluation" completed on February 24, 2009 (Tr. 377). The evaluation was not signed. The fourth exhibit was an April 2009 questionnaire completed by Dr. Kooistra (Tr. 378). Dr. Kooistra opined that the plaintiff should limit her writing; could not walk or stand for more than a few minutes during a work day; and would miss more than five days of work per month if she tried to work on a full-time basis. The fifth exhibit was a nerve conduction study performed in February 2009, which was apparently the testing that Dr. Kooistra referred to in the first exhibit (Tr. 379-84). The sixth exhibit was comprised of reports from the plaintiff's chiropractor, dated February, June, and October 2008 (Tr. 386). The seventh exhibit was the plaintiff's request for review (Tr. 387-89).

After the plaintiff submitted her request for review, she submitted additional exhibits (Tr. 390-457). The eighth exhibit was a statement from the plaintiff's chiropractor, who wrote that she had treated the plaintiff ten times between 2007 and January 2009. She opined that the plaintiff had been limited to sedentary work since 2006 (Tr. 391). The ninth exhibit consisted of school records (Tr. 392-97). The tenth exhibit consisted of treatment notes from Dr. Whitehead, dated June 2008 through July 2009 (Tr. 399-415). The eleventh exhibit was a series of x-rays from July 2009 (Tr. 416-17). The twelfth exhibit consisted of records from Dr. Whitehead from January and February 2010 (Tr. 422-26).

The thirteenth exhibit was a statement from Dr. McGuirt, dated February 19, 2010. Dr. McGuirt wrote that he treated the plaintiff from April 2002 to February 2004. He opined that the plaintiff had osteoarthritis and her symptoms suggested some type of connective tissue defect. He confirmed that he had restricted her to occasionally using her hands during the day. He wrote that the plaintiff had missed a number of work days when he treated her, but that some of the days she missed were due to surgeries unrelated to her

11

osteoarthritis.  He opined that, when he was treating the plaintiff, she was unable to return to her work as a grinder (Tr. 428-29).

The fourteenth exhibit was a letter from Dr. Whitehead, dated February 12, 2010.  Dr. Whitehead wrote that he treated the plaintiff beginning in June 2009.  He opined it was probable that the plaintiff could not stand for more than 15 minutes at once and that she could sit for a prolonged period, but would need to shift positions periodically to standing.  He also opined that the plaintiff would need to be away from the work station for more than an hour of the work day (Tr. 430).  The fifteenth exhibit was a form completed by Dr. DeGarmo in March 2010.  Dr. DeGarmo indicated that the plaintiff was unable to perform the exertional requirements of even sedentary work (Tr. 432-33).  The sixteenth and final exhibit was comprised of emergency room records dated from December 2008 through January 2010 (Tr. 435-55).

The Appeals Council reviewed these additional exhibits.  The Appeals Council concluded that because this evidence was dated after the plaintiff's date last insured, this evidence did not affect the ALJ's decision (Tr. 8, 11-12).

### ANALYSIS

The plaintiff was 41 years on her alleged disability onset date.  The ALJ found that she had the following severe impairments:  status-post discectomy and fusion at C6-7, degenerative disc disease, obesity, and depression.  He further determined that the plaintiff had the residual functional capacity ("RFC") to perform medium work except she was unable to use her upper extremities to perform overhead work.  Also, due to symptoms of depression and pain, she was unable to perform more than the simple, routine, repetitive tasks of unskilled work.  The ALJ determined the plaintiff could perform her past relevant work as a waitress and cashier.  The plaintiff argues that the ALJ erred by (1)  failing to properly evaluate the opinion evidence; (2)  failing to properly determine her RFC; and (3) determining she could perform her past work as a waitress and cashier.  The plaintiff further

argues that the case should be remanded for consideration of the new and material evidence submitted to the Appeals Council.

### *Opinion Evidence*

The plaintiff first argues that the ALJ failed to properly consider the opinion of her primary treating physician, Dr. DeGarmo.  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1)  the length of the treatment relationship and the frequency of the examinations; (2)  the nature and extent of the treatment relationship; (3)  the evidence with which the physician supports his opinion; (4)  the consistency of the opinion; and (5)  whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.    These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927].  In many cases,

13

> a treating source's medical opinion will be entitled to the
> greatest weight and should be adopted, even if it does not meet
> the test for controlling weight.

*Id.* at *4.

On January 8, 2007, Dr. DeGarmo completed a Physical Capacity Evaluation, which indicated that the plaintiff was limited in each sitting, standing, and walking to one hour at a time, and each limited to two hours total in an eight hour day. Dr. DeGarmo stated that the plaintiff could lift and/or carry up to ten pounds occasionally and could never lift and/or carry 11 pounds or more. Regarding repetitive actions, Dr. DeGarmo stated that the plaintiff could use her right hand for simple grasping and fine manipulation, but could not use her left hand for these actions. She could not use either her right or left hands for pushing or pulling of arm controls. Regarding the use of feet for repetitive movements as in pushing and pulling leg controls, Dr. DeGarmo stated that she could use her right side, but not her left. The plaintiff could occasionally bend, but could not squat, crawl, climb or reach at all. She had a total restriction in activities involving unprotected heights and moderate restrictions in activities of being around moving machinery, exposure to marked changes in temperature and humidity, driving automobile equipment, and exposure to dust, fumes, and gases. Dr. DeGarmo's findings included neck pain, cervical radiculopathy, low back pain, degenerative joint disease, GERD, and polyarthralgia (Tr. 360).

Dr. DeGarmo also completed a Clinical Assessment of Pain form on this date, stating that the plaintiff's pain is "present to such an extent as to be distracting to adequate performance of daily activities of work." Physical activities such as walking, standing, bending, stooping, and moving of extremities cause an "increase of pain to such a degree as to require increased medication for pain or substantial amounts of bed rest." Her medications "will place severe limitation on the patient's ability to perform even the most simple tasks." Regarding the plaintiff's ability to perform her previous work activities, Dr.

14

DeGarmo stated that her pain and/or drug side effects can be "expected to be severe and to limit effectiveness due to distraction, inattentiveness, drowsiness, etc." There was little improvement likely regarding the plaintiff's long term prospects for recovery, and her pain was "likely to increase with time." Treatments, such as biofeedback, nerve stimulation, injections, etc, have had "no appreciable impact or have only briefly altered the level of pain that Reid experiences." Dr. DeGarmo stated that "Due to chronic pain, Ms. Reid requires pain meds. The use of pain meds restrict activity. Physical therapy has not helped" (Tr. 361).

> The ALJ found as follows with regard to Dr. DeGarmo's opinion:
>
> Dr. DeGarmo's opinion is given little weight. The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. His office notes do not support the conclusions and the course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were totally disabled. In addition, the doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor did not specifically address this weakness.

(Tr. 28).

The plaintiff argues that the ALJ erred in giving Dr. DeGarmo's opinion little weight. Specifically, the plaintiff first argues that the ALJ erred in failing to set out the record evidence showing that Dr. DeGarmo relied "heavily" on her subjective complaints. The plaintiff notes that Dr. DeGarmo was her primary treating physician, and he explained that his opinion was based on her neck pain, cervical radiculopathy, lower back pain, degenerative joint disease, and polyarthralgias (Tr. 360). Furthermore, Dr. DeGarmo's office notes cited objective findings including "MS tender cervical spine, x-rays reveal herniated disc of C6-C7" (Tr. 364). The plaintiff also cites treatment records from other providers that show objective findings regarding her impairments (pl. reply brief at 3-4).

15

The plaintiff further argues that the ALJ erred in failing to cite any evidence supporting his findings that Dr. DeGarmo's "office notes do not support his conclusions" and that the plaintiff's treatment was not "what one would expect if Reid was *totally disabled*" (Tr. 28) (emphasis added). As argued by the plaintiff, there is no legal definition or standard for "totally disabled," and thus the ALJ cannot reject a medical opinion based on the perceived absence of something never defined that he expects to see in a doctor's treatment report. The Commissioner's explanation that Dr. DeGarmo's opinion that plaintiff's exertional limitations would result in her working less than six hours per eight hour workday was, effectively, an opinion that the plaintiff was totally disabled, is a post hoc rationalization not provided by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

The plaintiff also argues that the ALJ erred in giving "considerable weight" to the August 30, 2004, opinion of Dr. Kooistra, in which Dr. Kooistra found that the plaintiff had "a 15% impairment of her left upper extremity as a result of her employment as a barrel grinder" (Tr. 28; *see* Tr. 299-310). The Commissioner argues in support of the ALJ's finding noting that "Dr. Kooistra did not preclude Plaintiff from all work, only her past work as a barrel grinder" (def. brief at 11-12). However, Dr. Kooistra's opinion was from a one-time evaluation generated for a worker's compensation claim that dealt exclusively with the work-related portion of the plaintiff's impairments.

This court finds that, upon remand, the ALJ should be instructed to reconsider Dr. DeGarmo's opinion in accordance with the foregoing discussion.

### *Residual Functional Capacity*

The plaintiff further argues that the ALJ erred in his RFC determination.

Social Security Ruling 96-8p, 1996 WL 374184, provides:

> The RFC assessment must include a narrative discussion
> describing how the evidence supports each conclusion, citing
> specific medical facts (e.g., laboratory findings) and nonmedical
> evidence (e.g., daily activities, observations).  In assessing
> RFC, the adjudicator must discuss the individual's ability to
> perform sustained work activities in an ordinary work setting on
> a regular and continuing basis (i.e., 8 hours a day, for 5 days a
> week, or an equivalent work schedule), and describe the
> maximum amount of each work-related activity the individual
> can perform based on the evidence available in the case
> record.  The adjudicator must also explain how any material
> inconsistencies or ambiguities in the evidence in the case
> record were considered and resolved.

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

The plaintiff argues that the ALJ erred in failing to provide a function-by-function assessment .  Instead, he gave the broad category of medium work without any finding of the amount the plaintiff can lift, carry, stand, walk, and sit.  The plaintiff notes that she testified that she can only sit for about 15 to 20 minutes and can only stand for 15 to 20 minutes (Tr. 479-80) and that Dr. DeGarmo's physical capacity assessment supports her testimony (Tr. 360 (opining that the plaintiff could sit, stand, and walk each for one hour at one time)).  As argued by the plaintiff, without the ALJ providing his reasoning, this court cannot determine if the decision is based upon substantial evidence.

### *Vocational Expert*

The plaintiff next argues that the ALJ failed to incorporate all of the limitations he found into his hypothetical to the vocational expert.  Specifically, the ALJ found that due to her pain and depression, the plaintiff had "moderate limitation in her ability to maintain

attention and concentration," and in his RFC finding, the ALJ found that "due to symptoms of depression and pain, [the plaintiff] was unable to perform more than simple routine repetitive tasks of unskilled work" (Tr. 25). In his hypothetical to the vocational expert, the ALJ stated that the plaintiff would be limited to unskilled work[2] "based on her complaints of pain and depression limiting her ability to focus and attend" (Tr. 492).

The plaintiff contends that the limitation to unskilled work was insufficient to encompass her impairments since the ALJ found she had a moderate deficiency in concentration, persistence, or pace. The plaintiff notes that the issue has not been addressed by the Fourth Circuit and cites other circuits in support of her argument (pl. reply at 8-9). The Commissioner argues that the limitation was consistent with the RFC and was sufficiently precise for the vocational expert to give a reliable answer. This court agrees. However, as this court finds that remand is appropriate for other reasons as discussed herein, the ALJ should be instructed upon remand to include the plaintiff's moderate deficiency in concentration, persistence, or pace in his hypothetical to the vocational expert.

The plaintiff further argues that the ALJ failed to properly evaluate her past relevant work. The plaintiff testified that she performed the combined duties of waitress and cashier, as well as stocking duties (Tr. 79-81). The vocational expert testified in response to the hypothetical that the plaintiff's "waitress and her cashier jobs are SVP[3] of 2, unskilled. So I believe these would meet the meaning of that hypothetical" (Tr. 492). The vocational expert did not identify the *Dictionary of Occupational Titles ("DOT")* numbers for the jobs he identified (*see* Tr. 492).

---

[2]The mental demands of unskilled work include the ability to understand, carry out, and remember simple instructions. SSR 85-15, 1985 WL 56857, at *4.

[3]"The DOT lists a specific vocational preparation ("SVP") time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." SSR 00-4P 2000 WL 1898704, at *3.

The plaintiff points out that the occupation of Waiter/ Waitress, Informal, as identified in *DOT* number 311.477-030, has an SVP of three and a General Educational Development[4] reasoning level ("GED:R") of three, which exceeds the ALJ's RFC assessment of the plaintiff being unable to perform more than "simple routine repetitive tasks of unskilled work" (Tr. 25). The Commissioner argues that "as that job has an SVP of three, the vocational expert was not referring to it when identifying unskilled jobs" (def. brief at 15). Instead, the Commissioner cites occupations listed at *DOT* numbers 311.677-010 (Cafeteria Attendant, SVP 2, GED:R 2), 352.677-018 (Waiter/ Waitress, Club, SVP 2, GED:R 2), and 211.462-010 (Cashier II, SVP 2, GED:R 3) as being consistent with the vocational expert's testimony. However, as argued by the plaintiff, since the vocational expert did not identify by number the jobs to which he was referring, the Commissioner is merely speculating as to what job was identified.

Furthermore, the Cashier II (as well as the Waiter/Waitress, Informal position identified by the plaintiff) occupation has a reasoning level of three, which the plaintiff argues exceeds the ALJ's RFC assessment that she was unable to perform more than "simple routine repetitive tasks of unskilled work." Although the Fourth Circuit has not yet decided the issue, several district courts within this circuit have remanded for further administrative proceedings where the ALJ failed to inquire to the vocational expert regarding whether a claimant limited to simple, routine, repetitive work was capable of

---

[4]"[GED] embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." U.S. Dept. of Labor, DOT, App. C § III, 1991 WL 688702 (Fourth Ed. Rev.1991). The DOT specifies the GED requirements required for each job, including the level of reasoning skills. Reasoning level one requires the worker to "[a]pply commonsense understanding to carry out simple one-or two-step instructions [and][d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.* Reasoning level two requires the worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and][d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* Reasoning level three requires the worker to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and][d]eal with problems involving several concrete variables in or from standardized situations." *Id.*

performing certain jobs that the DOT classified as reasoning level three or lower. *See Yurek v. Astrue*, No. 5:08-cv-500-FL, 2009 WL 2848859, at *9 (E.D. N.C. 2009) (slip copy) (finding "that the DOT's reasoning level three requirement conflicts with the ALJ's prescribed limitation that Claimant could perform only simple, routine, repetitive work" and remanding to the ALJ to address the conflict); *Tadlock v. Astrue*, C.A. No. 8:06-3610-RBH, 2008 WL 628591, at *10 (D.S.C. 2008) (remanding so that the vocational expert could give testimony as to whether the plaintiff could perform the recommended jobs, which had a reasoning level of two, considering the claimant's inability to do more than simple and routine work). The Commissioner argues in a cursory fashion, without citation to any authority, that "there is no merit to Plaintiff's argument that the residual functional capacity found by the ALJ precluded her from performing a job with a reasoning level of three" (def. brief at 15).

Social Security Ruling 00-4p provides in pertinent part:

When a [vocational expert ("VE")] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the [Dictionary of Occupational Titles ("DOT")]. In these situations, the adjudicator will:

Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and

If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

20

SSR 00-4p, 2000 WL 1898704, at *4.  Here, there is an apparent conflict between what the plaintiff is capable of performing and what the recommended jobs require.  Upon remand, the ALJ should be instructed to obtain vocational expert testimony as to the specific occupations, including *DOT* number, that the plaintiff can perform.  The ALJ should be further instructed to obtain vocational expert testimony as to any conflict between the reasoning levels for such jobs and the limitation that the plaintiff can perform only simple, routine, repetitive tasks of unskilled work.

Furthermore, the plaintiff notes that the ALJ failed to acknowledge a sworn statement from Benson Hecker, a certified vocational expert, in which Mr. Hecker stated his opinion that, based upon his review of the plaintiff's medical records, she could not engage in substantial gainful employment (*see* Tr. 122-26).  Upon remand, the ALJ should be instructed to provide an explanation for any weight given - or not given - to this opinion.

### Appeals Council Evidence

As set forth above, the plaintiff submitted 16 exhibits to the Appeals Council. The Appeals Council stated that "the new medical information is dated after date last insured.  Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits" (Tr. 8).  The plaintiff argues that the Appeal Council erred in so finding with regard to the opinion of Dr. McGuirt.  This court agrees.

In the opinion, which is dated February 19, 2010, Dr. McGuirt stated that he treated the plaintiff between April 2002 and February 2004, and that, during that time period, she suffered from osteoarthritis in multiple joints, degenerative disc disease in her cervical spine, and some kind of disease of the connective tissue (Tr. 428-29).  The plaintiff argues that where, as here, the ALJ found that there was a lack of support for the opinion of the plaintiff's treating physician, Dr. DeGarmo, the new evidence is particularly important as it indicates the plaintiff had a most severe condition as early as 2004.

21

In *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), the Fourth Circuit held that the Appeals Council is not required to articulate its rationale for denying a request for review. *Id.* at 707. The Fourth Circuit then stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence. *Id.* Further, the court held that when the evidence is one-sided, the court may be able to determine whether substantial evidence supports the ALJ's decision. *Id.* In *Meyer*, however, the court held it could not determine whether substantial evidence supported the ALJ's decision and thus remanded the case to the Commissioner for a rehearing. *Id.*

In light of the foregoing decision, the Commissioner argues that the opinion from Dr. McGuirt did not relate to the relevant time period and was not inconsistent with the ALJ's decision, and thus remand is inappropriate. However, as noted above, Dr. McGuirt's opinion does relate to the relevant time period.

Given the errors of law described above with regard to the other issues raised by the plaintiff, remand to the ALJ is appropriate. Accordingly, upon remand, the ALJ should be instructed to consider the entire record, including the 2010 opinion of Dr. McGuirt.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above

s/ Kevin F. McDonald
United States Magistrate Judge

February 8, 2012
Greenville, South Carolina